■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v LYNNE FORD, Respondent. — Order, Supreme Court, New York County (H. Davis, J.), entered February 19, 1980 granting defendant's motion to set aside a jury verdict finding her guilty of a scheme to defraud in the first degree, unanimously reversed, on the law and the facts, the jury verdict is reinstated and the defendant is directed to surrender for further proceedings. Defendant and her husband Augusto Ford were convicted by a jury of the crime of scheme to defraud in the first degree (Penal Law, § 190.65), which reads as follows: "1. A person is guilty of a scheme to defraud in the first degree when he (a) engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud ten or more persons or to obtain property from ten or more persons by false or fraudulent pretenses, representations or promises, and (b) so obtains property from one or more of such persons. 2. In any prosecution under this section, it shall be necessary to prove the identity of at least one person from whom the defendant so obtained property, but it shall not be necessary to prove the identity of any other intended victim." This court has affirmed the conviction of Augusto Ford, defendant's husband (86 AD2d 987). This is the People's appeal from the Trial Judge's order setting aside the verdict against Lynne Ford, the wife. Nine witnesses testified that they answered defendants' advertisement in the *New York Times* listings for "Business Opportunities", under "Financing and Business Loans". The advertisements offered "Business loans to start, expand, combine billing, venture capital, from five thousand to five million". A call to the numbers listed in the advertisement connected the caller with the defendant or her husband at their office located at 342 Madison Avenue in Manhattan. Each was told to come to the office after explaining his respective needs and purposes. Each was told that he or she could be helped with a loan. The witnesses who testified were primarily persons without capital or business experience, all seeking money to start small businesses of their own. Some had been turned down by traditional credit sources, and they resorted to the columns of the *New York Times* as a last resort. In essence, applicants were told that they could obtain the financing sought in return for a flat fee and a percentage of the loans obtained. Not all of the witnesses dealt with the defendant. The degree of contact varied among those who did. Rafael Penor answered an ad in the hopes of obtaining a $10,000 loan. Penor paid Augusto Ford a $500 fee for Augusto's alleged effort to obtain a loan from a finance company in Colorado. Although Augusto indicated that the fee was refundable if the loan application was rejected, he refused to refund the fee when the applicant was actually rejected. Defendant was present during some of Penor's transactions and conversations with Augusto. Joseph Kemp sought a $50,000 loan. After speaking with defendant on the phone, Kemp made an appointment to see Augusto. At the meeting Kemp discussed his proposed business with both defendant and Augusto. They gave Kemp a list of documents to prepare. After two more meetings in which defendant took part, Kemp turned over a $600 check given to him by a friend. Although some of the documents were missing, defendant said they were not necessary. She said the statements "looked good." After two additional meetings defendant said they had "checked [Kemp] out" and he "was okay". Defendant was to help Kemp prepare a brochure. Subsequently defendant said the brochure was good and would "do the trick". Two weeks later defendant reported that the lenders wanted security, ten thousand dollars "to show good faith." Finally Kemp gave defendant and Augusto a check for $2,000 "to show good faith". Both defendant and Augusto endorsed the check. Kemp, too, received neither a loan nor a return of the $2,000 although defendant several times told Kemp that Augusto was working on the loan and there "would be no problem". Several months

later, defendant advised him that Augusto "knew nothing about the loan business". Christine Rizzo wanted $50,000 to start a casino dealer's school. Rizzo said defendant identified herself as "Reverend Ford" when she spoke on the phone. When Rizzo came to the office defendant was wearing a long Judge-like robe. Defendant told Rizzo how to improve her proposal. Augusto told Rizzo she could expect the money in a couple of weeks. A week later, Rizzo was advised that her proposal was so good that she could pay a reduced fee of $500 for processing. At the next meeting, Rizzo gave a $500 check to Augusto after she signed a contract prepared by defendant. Defendant was listed as vice-president. Rizzo testified that defendant did most of the talking at the meeting, describing herself as a reverend whose word was good. Both defendant and Augusto guaranteed Rizzo would get the loan. Rizzo never obtained the loan nor a refund of her fee although defendant several times told her the money was forthcoming. Arturo Smith sought $6,000 to open a candy store. After speaking on the telephone with "Mrs. Ford", Smith paid $300 to Augusto. John Parker testified that defendant said she and her husband worked together to secure loans for others. Parker said that he was seeking $25,000 for a decorating business. Augusto said the fee would be $5,000. When that deal failed, Parker sought to obtain a loan to purchase a hardware store for $100,000. Defendant said the fee to process this loan was only $2,500. Based on these assurances, Parker placed a deposit on a store. At a further meeting, defendant and Augusto told Parker he should apply for a $500,000 loan for the same $2,500 fee. Parker paid the fee in three installments. He was given a $250 refund for an overpayment. Ultimately the owner of the store sold to another buyer, and Parker lost the fee. He again sought the Fords' help when he made plans to buy a $60,000 house, but incurred no further loss because he lost contact with the Fords. George Bloomfield wanted $350,000 to convert a theatre into a restaurant. After a three-way telephone conversation among Augusto, Bloomfield and Bloomfield's employer, Bloomfield turned over to Augusto a $2,000 check that his employer had drawn. Defendant was in the office on the day Bloomfield turned over the check. Bloomfield picked up one of defendant's business cards, identifying her as "Reverend Doctor M. Lynne Ford, International Financier". Bloomfield testified that defendant claimed she and her husband Augusto were specialists in minority financing, and Bloomfield's folder would be sent to lenders. Over the next month, Bloomfield gave defendant various documents from time to time, for the "file", "under the impression I was dealing with Lynne Ford" as well as Augusto. Defendant referred Bloomfield to one "Joe Proctor" in Washington, who wanted $1,300 more to secure the loan. Defendant and her husband disclaimed responsibility for this. Bloomfield received neither the loan nor a return of his $2,000. Amerish Ram Gagadeen planned to buy a hotel in Atlantic City, for which he sought a $175,000 loan. Gagadeen paid $2,000 to Augusto, who promised a refund if no loan was obtainable. Gagadeen subsequently received a letter requesting more information. The letter was on the stationery of "Diversified Financing", listing Dr. F. Augusto Ford as president and Reverend M. Lynne Ford as vice-president. Gagadeen was also referred to Proctor. When Gagadeen finally demanded the return of his money, defendant advised him "You're not dealing with me, you're dealing with him." Gagadeen initially thought defendant was a secretary until he learned that she was Augusto's wife when she told Gagadeen they would need an accounting of the hotel's profits. Gagadeen received no loan and no refund. Vincent Cudiner sought $1 million to produce an asbestos substitute. In a four-way conversation among defendant, Augusto, Cudiner and Cudiner's wife, Cudiner was advised there was "no doubt" about getting a loan. The fee would be $1,200 to $2,400. When Cudiner questioned

the idea of advance payment, defendant asked if Cudiner wished to invest in a church. Cudiner furnished certain documents which were not returned. A fee of $100 was requested by Augusto. Jessie Massey needed $1,500 to buy a house. Augusto persuaded her to apply for a $1,750 loan for which the fee would be $500. When Massey turned over her check at a second meeting, defendant claimed that she "set the rates for the loans". Massey was fortunate. She received her money back because she failed to endorse the bank check that she had drawn. Produced at trial, the check bore Massey's signature as well as the signatures of defendant and Augusto. By the time of trial, Augusto and Lynne were estranged. Augusto called Lynne as his witness, but she refused to testify. In no instance did any person obtain a loan at the instance of the Fords, nor did the Fords return any of the money paid over by the victims. The time period over which these transactions occurred and representations were made was between January of 1977 and July of 1978. As the Trial Judge noted in his careful and thoughtful opinion (103 Misc 2d 249), the scheme-to-defraud statutes were added to the Penal Law by chapter 384 of the Laws of 1976, effective January 1, 1977. The case law is sparse (see *People v Block & Kleaver,* 103 Misc 2d 758; *People v Lennon,* 107 Misc 2d 329). The practice commentary states that these sections "parallel the mail fraud statute", making "the nefarious character of the scheme rather than dollar loss to particular victims the essence of the crime." (Givens, Additional Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law, § 190.60, 1981-1982 Pocket Part, p 113.) "As under the federal cases, fraud would appear to include disregard to the truth of representations made to the victim." (*Id.,* p 114.) As the Trial Judge found, the ads were obviously intended to attract 10 or more persons into the defendants' office. The representations and promises made were plainly designed to prompt the victims to give their money to defendants. The victims did give their money to defendants in reliance upon their representations and promises. The victims received neither the loans nor refunds as promised. Obviously the intent to defraud called for in the statute could only be proved by circumstantial evidence. The Trial Judge noted (p 253) the well-settled rule: " 'The oft-stated rule with respect to convictions based exclusively upon circumstantial evidence is that for guilt to be proven beyond a reasonable doubt the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them; and the facts proved, must exclude "to a moral certainty" every reasonable hypothesis of innocence.' (*People v Benzinger,* 36 NY2d 29, 32.)" The court found no difficulty in denying the motion to set aside the verdict as to Augusto Ford under this standard. However, with respect to Lynne Ford, the Trial Judge felt that the evidence against her, although consistent with guilt, did not exclude to a moral certainty every other reasonable hypothesis. Although she worked in the same office with Augusto and was his wife, the proof was thought to be insufficient to establish beyond a reasonable doubt that she knew he was engaged in a scheme to defraud because her actions were limited. He concluded that her dealings with the victims were consistent with those of an innocent administrative assistant or office secretary whose duties included typing, answering the telephone, arranging business appointments for the victims and Augusto, revising business proposals made by the victims, furnishing status reports regarding loan applications and setting the fees for services. The Trial Judge concluded that all of these tasks were clerical in nature which could have been performed pursuant to Augusto's instructions. He concluded that "[p]erhaps Ford fooled Ms. Ford in the same manner and to the same extent that he fooled his victims. Certainly there is no evidence either way. If she had not been married to him and had in fact been hired only as a secretary, with all other things being

equal, she would, beyond cavil, probably not even have been indicted." (103 Misc 2d, *supra,* at p 254.) We disagree. Although great deference should be given to the views of the Trial Judge, the evidence was plainly sufficient for the jury to find that Lynne Ford was guilty of knowing participation in a scheme to defraud and that this was proven beyond a reasonable doubt. The rule that in circumstantial evidence cases guilt must be proven to a moral certainty does not mean absolute certainty. Defendant was plainly something more than a mere secretary. She did a good deal of talking to the victims. The bulk of her talking consisted of falsehoods. Her name was on the business letterhead as vice-president of Diversified Financing. Her business card as an "International Financier" was exhibited. She also participated in the meetings in which Augusto did all the talking. Her name appeared on at least one check. A carefully and properly instructed jury found her guilty. The Federal cases are instructive. The essential element is found where participation in the scheme is evidenced by defendant's own falsehoods (*United States v Cohen,* 516 F2d 1358, 1362) and by acquiescence in the falsehoods of an admitted participant (*United States v Caine,* 441 F2d 454, 457, cert den 404 US 827). Defendant did not limit her activity to mere bookkeeping or other legitimate or secretarial duties. She promoted the business by vouching falsely for Augusto's ability as well as her own to obtain loans, particularly for members of minority groups, by encouraging the victims to pay money, by assuring them that the loans or refunds were guaranteed although the agreements were to the contrary. By implying that she was a member of the clergy and by false assurances that the loans were being processed or that they had been approved, she demonstrated that she knew the business was fraudulent. Her participation in putting the loan proposals together, in setting fees and in asking for "good faith" money, among other things, makes it clear she was an integral part of the scheme. We should not disregard the husband-and-wife relationship as a basis for an inference of knowledge of the scheme's fraudulent nature. Both she and Augusto reported that they had worked together to secure the loans. Although it has not been shown that the proceeds were divided between the Fords, it does appear that she handled the checks furnished by at least two victims and endorsed Kemp's $2,000 check. In the Rizzo transaction Lynne Ford was the prime mover. She did "most of the talking". She made a critique of the proposal, approved it and said she had lenders. She assured Rizzo the loan was guaranteed despite the contract language, said her word as a "reverend" was good and put Rizzo off after the fee was paid. When Rizzo pressed, Lynne Ford assured her the loan had been approved and then put her off for two months. The evidence, taken as a whole, was sufficient to sustain the conviction (*People v Kennedy,* 47 NY2d 196, 201). The totality of the conduct established guilt beyond a reasonable doubt. Concur — Kupferman, J. P., Sullivan, Markewich, Fein and Asch, JJ.